**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| **IN RE:** | ) | **MDL NO.** |
| | ) | |
| **ARC INFLATORS PRODUCTS** | ) | |
| **LIABILITY LITIGATION** | ) | |
| | ) | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
TO THE NORTHERN DISTRICT OF GEORGIA AND FOR CONSOLIDATION
PURSUANT TO 28 U.S.C. § 1407**

Pursuant to 28 U.S.C. § 1407 and JPML Rule 6.2, Lisa Mann and Jimmy Mann, Plaintiffs in the case styled *Mann, et al. v. ARC Automotive, Inc., et al.*, U.S. District Court for the Northern District of Georgia, Case No. 1:22-cv-3285, submit this brief in support of their Motion to Transfer and Consolidate for Coordinated Pretrial Proceedings under 28 U.S.C. § 1407 to the Northern District of Georgia.

## INTRODUCTION

This motion for transfer seeks to transfer six actions pending in five different federal d i s t r i c t  courts asserting common factual allegations and involving overlapping claims, overlapping parties, similar classes, and similar legal issues ("Actions") along with future tag-alongs, to the Northern District of Georgia, and consolidate them for pre-trial purposes. *See* Ex. A, Schedule of Actions and the complaints and docket sheets for each appended thereto. This action concerns defective inflators manufactured by Defendant ARC Automotive, Inc. and its related entities ("ARC"), and installed in vehicles manufactured and distributed by General Motors LLC, FCA US LLC, Audi Aktiengesellschaft, Audi of America, LLC, Bayerische Motoren Werke Aktiengesellschaft, BMW of North America, LLC, Ford Motor Company, Joyson Safety Systems, Porsche Cars North America, Inc., Toyoda Gosei North America, Inc.,

Volkswagen Aktiengesellschaft, Volkswagen Group of America, Inc., Hyundai Motor Group, Hyundai Motor Company, Hyundai Motor America, Kia Motors America, Inc., Kia Motors Corporation, Hyundai Mobis Co., Ltd., Mobis Parts America, LLC and its related entities (collectively the "Vehicle Manufacturer Defendants").  The defect is the dispersion of shrapnel upon rupture of the inflators.

## BACKGROUND OF THE LITIGATION

### I.     Factual Contentions

ARC Automotive Inc. is a leading manufacturer of airbag inflators, a critical safety device in all modern motor vehicles. Airbag modules containing ARC Automotive Inc. hybrid inflators are installed in at least 30 million vehicles in the United States and everyday millions of people utilize these vehicles. Since at least July of 2015, ARC Automotive Inc. and the Vehicle Manufacturer Defendants have been aware of an issue concerning hybrid inflators manufactured by ARC and installed into cars by the Vehicle Manufacturer Defendants due to an ongoing National Highway Traffic Safety Association ("NHTSA") investigation into reports of ruptured inflators that had dispersed shrapnel, injuring or even killing vehicle occupants. Defendants should have been aware of the defective inflators from internal testing and from reports concerning incidents. Since no later than 2015, the Vehicle Manufacturer Defendants have been well aware of the risks ARC takes with its production process and lacking quality control measures during the manufacture of its hybrid inflators.  Despite this knowledge, ARC continued to manufacture millions of inflators and the Vehicle Manufacturer Defendants continued to purchase millions of inflators for installation into their vehicles.

Additionally, ARC continued to advertise and sell these inflators to individuals all while failing to implement either a design change or process and quality control changes to eliminate

the excess weld flash present in the defective inflators. This inflator defect has caused at least 2 deaths and 4 injuries, all of which are attributable to these inflators rupturing.

## II.        Legal Contentions

As a result of a defective design and defective manufacturing process resulting in a common, uniform defect—the presence of excess friction weld flash inside the inflators—instead of protecting vehicle occupants from bodily injury during accidents, the defective airbag modules too often violently explode and rupture, expelling metal debris and shrapnel at vehicle occupants.

The inflators in the vehicles purchased by plaintiffs suffer from a design defect as follows: the design of the inflators fails to account for the excess, asymmetrical weld flash which is a byproduct of the friction welding process that is required to manufacture these inflators according to ARC's design. During manufacture of these inflators, the friction welding process creates excess, asymmetrical weld flash at the interface between the inner diameter of the support tube and the upper pressure vessel. During deployment of the inflator during an accident, a portion of this excess, asymmetrical weld flash can become dislodged. If the dislodged weld flash is not large enough to block the gas exit orifice, this weld flash will exit the inflator through the gas exit orifice. If the dislodged weld flash is sufficiently large, it will lodge in the gas exit orifice, resulting in an increase of pressure in the inflator housing, and causing a rupture ("Inflator Defect" or "Defect").

As a result of Defendants' misconduct, Plaintiffs and members of the proposed classes were harmed and suffered actual damages. The defective airbag modules containing the inflator defect significantly diminish the value of the cars in which they are installed.

Plaintiffs and the classes did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Purchasers or lessees of the class vehicles (vehicles which have this defective inflator) paid more, either through a higher purchase price or higher lease payments, than they would have had the defects been disclosed.

These consolidated actions seek, to the extent they can, some measure of justice for those who have been harmed by the illegal and tortious acts of Defendants.  They seek both compensatory and punitive damages in an amount reflective of the egregious nature of the defendant's conduct. They also seek injunctive relief to compel ARC and the Vehicle Manufacturer Defendants to take immediate and effective action to either (1) replace all of the defective airbag modules with airbag modules that do not contain inflators with the friction weld flash defect, or (2) immediately institute a re-purchase program to take all of the unsafe class vehicles off the road.

### III.    Plaintiffs

All plaintiffs in the pending Actions have filed civil class actions arising from ARC's defective design and manufacturing of the inflators. The Actions are pursued on behalf of all persons who own, owned, lease, or leased a class vehicle.  While only certain of the Vehicle Manufacturer Defendants are named defendants in each individual related action, each Vehicle Manufacturer Defendant has been named as a defendant in at least one related action.

Plaintiff Lisa Mann purchased a 2011 Buick Enclave for personal, family, and/or household use on or around September 2017 in or around Atlanta, Georgia. At the time, Plaintiff

reasonably expected that the airbags in the vehicle would not contain a safety defect.  Plaintiff had no way of knowing the vehicle contained the inflator defect. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and/or the internet that touted the safety and reliability of the vehicle. Defendants concealed the existence of the inflator defect from Plaintiff and consumers. Plaintiff would not have purchased the vehicle, or would have paid less for it, if Defendants did not conceal material information about the inflator defect and as a result, the value of Plaintiff's vehicle has diminished. One of the main reasons that Plaintiff purchased her vehicle was for its supposed safety and the existence of fully functioning and safe airbags.

Plaintiff Jimmy Mann purchased a 2014 Cadillac SRX for personal, family, and/or household use on or around November 2021. At the time, Plaintiff reasonably expected that the airbags in the vehicle would not contain a safety defect.  One of the main reasons that Plaintiff purchased his vehicle was for its supposed safety and the existence of fully functioning and safe airbags. Plaintiff had no way of knowing the vehicle contained the inflator defect that could cause serious bodily harm. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and/or the internet that touted the safety and reliability of the vehicle. Defendants concealed the existence of the inflator defect from Plaintiff and consumers. Plaintiff would not have purchased the vehicle, or would have paid less for it, if Defendants did not conceal material information about the inflator defect and as a result, the value of Plaintiff's vehicle has diminished.

### IV.    Defendants

Defendant ARC Automotive, Inc. ("ARC") is a Delaware corporation, with manufacturing facilities in Morgantown, Kentucky and Hartsville, Tennessee, among others. ARC is a global

manufacturer that produces a full complement of inflators for automotive airbag applications. ARC delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States.  ARC was acquired and is wholly-owned by the Yinyi Group as of 2016. The Yinyi Group is a large group corporation with business in real estate development, resource industry, new materials and technologies development, domestic and international trade, property management, logistics, warehousing, construction material and five-star hotels. Yinyi maintains its headquarters in China. Defendant ARC is the manufacturer of all the faulty airbags recalled by the NHTSA that are the subject of plaintiffs' complaints.  The Vehicle Manufacturer Defendants each installed ARC airbag inflators in their consumer vehicles.

### V.        Status of the Actions

Plaintiffs filed the related actions in five different Federal District Courts sitting in five different states. Given the infancy of these cases, none of the Actions have proceeded towards class certification nor trial such that transfer  would be unduly prejudicial or inefficient.  No orders on dispositive motions have been entered and no responses to complaints have been filed. These Actions are in the earliest procedural stage and it is a convenient time to  coordinate the Actions.

### LEGAL AUTHORITIES AND ARGUMENT

### I.        The Panel Should Centralize This Litigation Under § 1407.

Transfer and pretrial coordination of the Actions in a single court is appropriate and will  promote the goals of 28 U.S.C. § 1407. Transfer is appropriate where: (A) "civil actions involving  one or more common questions of fact are pending in different districts"; (B) transfer  and  coordination "will promote the just and efficient conduct of such actions"; and (C) transfer and  coordination will serve "the convenience of parties and witnesses." 28

U.S.C. § 1407(a). Each  criterion is amply satisfied here.

The purpose of multidistrict litigation is to "eliminate the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts in multidistrict related  civil actions." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 491-92 (J.P.M.L. 1968).  Coordination is meant to "assure uniform and expeditious treatment in the pretrial procedures in  multidistrict litigation." *See* H.R. Rep. No. 1130, 90th Cong., 2d Sess. 1 (1968), reprinted in 1968  U.S.C.C.A.N. at 1901. Without centralization "conflicting pretrial discovery demands for  documents and witnesses" can "disrupt the functions of the Federal courts." *Id.* at 1899. Here,  centralization is the only way to ensure consistent pretrial rulings and efficient use of judicial  resources.

### A.  All of the Cases Involve Common Questions of Fact.

First, the pending Actions involve common questions of fact. Transfer under Section 1407 "does not require a complete identity or even a majority of common factual or legal issues  as a prerequisite to transfer." *In re Rembrandt Technologies, LP, Patent Litig.*, 493 F. Supp. 2d  1367, 1370 (J.P.M.L. 2007). Here, the claims in the six pending Actions all share at least  one common defendant, ARC.  Many also share common Vehicle Manufacturer Defendants.  Each of the Actions involve common questions of fact and core nucleus of similar allegations that will be the subject of discovery and a common focus of pretrial proceedings.

Some of the common questions of fact include:

- Whether the hybrid inflator was defective;

- Whether ARC and the Vehicle Manufacturer Defendants had knowledge of the existence of a defect;

- Whether ARC did adequate testing of the inflator;

- Whether ARC and the Vehicle Manufacturer Defendants breached their duty of care to plaintiffs;

- Whether ARC and the Vehicle Manufacturer Defendants breached any warranty, express or implied, related to their sale of the inflator.

To the extent "non-common" issues of fact exist, the centralization of all actions nevertheless ensures the pivotal common issues of fact will be able to proceed in an orderly, consistent, and efficient manner. *See In re Ephedra Prods. Liab. Litig.*, 314 F. Supp. 2d 1373 (J.P.M.L. 2004). As this Panel previously held, "transfer to a single district under Section 1407 has the salutary effect of placing all the related actions before a single judge who can formulate a pretrial program that: 1) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues . . . and 2) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties." *Id.* at 1375 (citations omitted). "Section 1407 does not require a complete identity or even a majority of common factual issues as a prerequisite to centralization." *In re Zimmer Durom Hip Cup Prods. Liab. Litig.*, 717 F. Supp. 2d 1376, 1378 (J.P.M.L. 2010); *see also In re Denture Cream Prods. Liab. Litig.*, 624 F. Supp. 2d 1379, 1381 (J.P.M.L. 2009). Instead, where, as here, the underlying factual and legal allegations are sufficiently similar, "[t]ransferee judges have demonstrated the ability to accommodate common and individual discovery tracks, gaining the benefits of centralization without delaying or compromising consideration of claims on their individual merits." *In re Yamaha Motor Corp. Rhino ATV Prods. Liab. Litig.*, 597 F. Supp. 2d 1377, 1378 (J.P.M.L. 2009); *see also In re: Zoloft (Sertraline Hydrochloride) Products Liab. Litig.*, 856 F. Supp. 2d 1347, 1348 (J.P.M.L.

2012) ("[W]e have found that products liability cases often present  some individual factual issues, but that coordination of discovery across all actions, with the use  of common and individual discovery tracks, can offer efficiencies to all parties.") (citing *In re  Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 780 F. Supp. 2d 1379, 1381 (J.P.M.L.  2011)).

 **B.** **Coordination promotes the just and efficient management of pretrial proceedings for all related actions.**

 Second, centralization will promote the just and efficient litigation of Actions. Consolidation of pretrial proceedings eliminates the likelihood of inconsistent rulings regarding the overlapping claims and other key threshold legal issues present in this litigation  regardless of what claims are raised. Although the precise causes of action raised in each of the  pending Actions are not identical, the primary causes of action are common throughout the cases  as a whole as they all seek to hold Defendants liable for the alleged defective design and manufacturing of the inflator. But "the presence of additional facts or differing legal theories is not significant where, as here, the actions still arise from a common factual core." *In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d 1388, 1390 (J.P.M.L. 2014).

 Moreover, plaintiffs seek certification of the same or similar class of plaintiffs in each case. This Panel has "consistently held that transfer of actions under Section 1407 is appropriate,  if not necessary, where the possibility of inconsistent class determinations exists." *In re Sugar  Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975); *see also In re Natrol, Inc.Glucosamine/Chondroitin Marketing and Sales Practice Litig.*, 26 F. Supp. 3d 1392, 1393  (J.P.M.L. 2014) (noting that centralization of three overlapping putative class actions was appropriate to "prevent inconsistent pretrial rulings[,] in particular with respect to class  certification and discovery issues").

 Finally, given that the alleged defective inflator has been installed in at least 30 million

vehicles in the United States, even more tag-along actions are likely to be filed. *See, e.g., In re Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*, 978 F. Supp. 2d 1379, 1381 (J.P.M.L. 2013) (granting § 1407 motion where the estimated number of affected customers across five states indicated that additional tag-along actions could also be filed).

### C.    Centralization Creates Convenience for the Parties and Witnesses.

Third, centralization will create convenience for the parties and witnesses and conserve judicial resources. Centralization is appropriate where it "will eliminate duplicative discovery" and "conserve the resources of the parties, their counsel, and the judiciary." *In re Commodity Exchange, Inc., Gold Futures and Options Trading Litig.*, 38 F. Supp. 3d 1394, 1395 (J.P.M.L. 2014); *see also Manual for Complex Litigation, Fourth* § 20.131 (2004) (Requests for Transfer) ("The objective of transfer [through the MDL process] is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts."). If the litigation is not centralized, Defendants will be subject to duplicative discovery demands and be forced to litigate the same issues before several courts, driving up litigation costs, putting them at risk of inconsistent rulings, and wasting judicial resources in the process.

### II.    The Northern District of Georgia is the Ideal Transferee Forum.

In selecting the transferee court, the Panel considers several factors, including "where the largest number of cases is pending, where discovery has occurred, where cases have progressed furthest, the site of the occurrence of the common facts, where the cost and inconvenience will be minimized, and the experience, skill, and caseloads of available judges." *Manual For Complex Litigation, Fourth* § 20.131 (2004).

**A.  The Northern District of Georgia is a convenient venue for consolidated proceedings.**

The Northern District of Georgia provides a convenient and easily accessible location for a geographically dispersed litigation. Plaintiffs, counsel, class members, experts and witnesses are likely to be located across the country and a district with convenient, accessible transportation is a requirement.  As such, travel will be needed for s o m e  counsel and/or plaintiffs regardless of the transferee court's location. The Northern District of Georgia is located in a major city with a  convenient international airport allowing easy access to every American metropolitan area, which  would allow for easy transport for witnesses and parties attending hearings, depositions o r  other meetings. Hartsfield-Jackson Atlanta International Airport is the world's busiest airport and as such is a central hub for travelers. It is also within driving distance of ARC's Tennessee business making discovery more efficient.  This makes getting a flight to Atlanta convenient for out of state witnesses, litigants, and counsel without the need for connecting flights.  Additionally, Plaintiffs Lisa Mann and Jimmy Mann are located only 146 miles (a 2.5 hour drive) from Atlanta, GA. As with *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 196 F. Supp. 2d 1375, 1376-77 (J.P.M.L. 2002), "a litigation of this scope will benefit from centralization in a  major metropolitan center that is well served by major airlines, provides ample hotel and  office accommodations, and offers a well-developed support system for legal services." *Id*. at 1355; *see also In re Jamster Mktg. Litig*., 427 F. Supp. 2d 1366, 1368 (J.P.M.L. 2006) (choosing a transferee forum in an "accessible metropolitan location"").

**2.  The Northern District of Georgia is Well-Suited to Manage the Demands of This Action.**

Determining whether the transferee court has the capacity to handle the litigation is a

factor this Panel has considered in the past. *In re Vioxx Prod. Liab. Litig.*, 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005) (assigning litigation to a jurist experienced in complex multidistrict products litigation and sitting in a district with the capacity to handle the litigation). The Northern  District of Georgia has both the capacity and experience to handle this MDL litigation. The Northern District of Georgia is well equipped with the resources required in a complex docket.  In fact, the Norther District is currently handling or previously handled the following MDLs:

- *In RE: Paragard IUD Products Liability Litigation*, MDL-2974

- *In RE: Ethicon Physiomesh Flexible Composite Hernia Mesh Products Liability Litigation,* MDL 2782,

- *In RE: Equifax, Inc., Customer Data Security Breach Litigation*, MDL-2800,

- *In RE: TransUnion Rental Screening Solutions, Inc., Fair Credit Reporting Act (FCRA) Litigation,* MDL-2933;

- *In RE: Atlas Roofing Corporation Chalet Shingle Products Liability Litigation,* MDL-2495

- *In RE: Wright Medical Technology, Inc., Conserve Hip Implant Products Liability Litigation*, MDL-2329

- *In RE: Camp Lejeune, North Carolina Water Contamination Litigation*, MDL-2218

- *In RE: Delta/AirTran Baggage Fee Antitrust Litigation,* MDL-2089

- *In RE: Androgel Antitrust Litigation (No. II)*, MDL-2084

- *In RE: ConAgra Peanut Butter Products Liability Litigation*, MDL-1845

More  generally,  the  docket  conditions  of  the  Northern  District  of  Georgia  are advantageous as well. *Table of U.S. District Court Combined Civil and Criminal Federal Court*

*Management Statistics, U.S. District Court – Judicial Caseload Profile*, *Northern Georgia* (June 30, 2022), https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0630.2022_0.pdf (last visited August 30, 2022). In the 12 months ending June 30, 2022, the median time from filing to disposition of civil matters within the District is five months, among the top three districts in the nation. Likewise, in that same time frame, the District has terminated 658 cases.

Judge Sara E. Geraghty, the Northern District of Georgia District Judge presiding over *Mann et al. v. ARC Automotive Inc.*, Case No. 1:22-cv-03285 is a well qualified jurist who can handle this MDL. While she is a relatively new jurist, over her 23-year legal career she has excelled at managing complex cases of all types. If Judge Geraghty is found by the JPML to not have the judicial experience necessary to handle this MDL, Plaintiffs respectfully suggest that Judge Mark Cohen, a seasoned jurist with substantial complex class action experience would be well suited to handle this MDL. Judge Cohen has presided over numerous class actions, including most recently the automotive defect case of *Pinon v. Mercedes Benz USA LLC et al.*, Case No. 1:18-cv-3984. The Northern District of Georgia is a well-equipped court with the judicial resources and experience needed for this case. Therefore, the Northern District of Georgia is well-suited to receive this complex MDL.

**3. Alternatively, The District of South Carolina – Charleston Division is Well-Suited to Manage the Demands of This Action.**

The related case of *Jophlin v. ARC Automotive, LLC et al.*, is pending in the District of South Carolina, Charleston Division before Judge Bruce Howe Hendricks. Judge Hendricks is a seasoned jurist who has the capacity and knowledge to handle this Action. The Charleston

International airport is a short drive to the Charleston Division court house and lodging is readily available.

The docket conditions of the District of South Carolina are also advantageous. Table of U.S. District Court Combined Civil and Criminal Federal Court Management Statistics, U.S. District Court – Judicial Caseload Profile, Northern Georgia (June 30, 2022), https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0630.2022_0.pdf (last visited August 30, 2022). In the 12 months ending June 30, 2022, the median time from filing to disposition of civil matters within the District is nine months, among the top forty districts in the nation. Likewise, in that same time frame, the District has terminated 450 cases.  Thus, in the alternative to the Northern District of Georgia, the District of South Carolina is well suited to handle this action and specifically Judge Hendricks.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Panel order these related actions, and any others that may be subsequently filed, consolidated and transferred under  Section 1407 to the Northern District of Georgia.


August 30, 2022                         Respectfully submitted,

By:  */s/ Taylor C. Bartlett*

Taylor C. Bartlett (GA Bar No. 778655)
W. Lewis Garrison, Jr.(GA Bar No. 286815)
Jeanie S. Sleadd (AL Bar No. 8464-G04T)
**HENINGER GARRISON DAVIS, LLC**
2727 Paces Ferry Road SE Suite 750
Atlanta, GA 30339
Phone: (800) 241-9779
Fax: (205) 326-3332
lewis@hgdlawfirm.com
taylor@hgdlawfirm.com

jsleadd@hgdlawfirm.com

Kevin R. Dean, Esq. (GA Bar No. 214855)
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Phone: (843) 216-9000
Fax: (843) 216-9450
kdean@motleyrice.com

*Attorneys for Movants Lisa Mann and Jimmy Mann and Plaintiffs listed below*

*(Mann, et al. v. ARC Automotive, Inc., et. al. Case. No. 1:22-cv-3285 (N.D. Ga.); Underwood et al. v. ARC Automotive, Inc., et al. Case No. 2:22-cv-01043-GMB (N.D. Ala.); Long v. ARC Automotive, Inc., et al. Case No. 2:22-cv-01098-NAD (N.D. Ala.))*